ROBERT B. WIYGUL, ESQ. (*pro hac vice*)
Waltzer Wiygul & Garside, LLC
1011 Iberville Drive
Ocean Springs, MS 39564
Tel: 228-872-1125
Fax: 228-872-1128
robert@waltzerlaw.com

GLORIA D. SMITH, ESQ. (*pro hac vice*)
Sierra Club Environmental Law Program
85 Second Street
San Francisco, CA 94105
(415) 977-5532/ Fax: (415) 977-5793
gloria.smith@sierraclub.org

CHRISTOPHER W. MIXSON, ESQ. (NV Bar No. 10685)
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300
cmixson@wrslawyers.com
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| THE MOAPA PAIUTES OF PAIUTE INDIANS, a federally recognized Tribe of Indians, <br> and <br> SIERRA CLUB, a California non-profit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> NEVADA POWER CO., d/b/a NV ENERGY, and <br><br> CALIFORNIA DEPARTMENT OF WATER RESOURCES, <br><br> Defendants. | Case No. 2:13-cv-01417-JAD-(NJK) <br><br> **PLAINTIFFS' MOTION FOR ATTORNEYS' AND EXPERTS' FEES AND COSTS; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF** |

1

**PLAINTIFFS' MOTION FOR ATTORNEYS' AND EXPERTS' FEES AND COSTS**

COME NOW Plaintiffs, the Moapa Band of Paiute Indians and Sierra Club, by and through their attorneys of record, who hereby move this Court for attorneys' fees, costs, and other expenses pursuant to the Clean Water Act, 33 U.S.C. § 1365(d), and the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(e). Plaintiffs are substantially prevailing parties in this matter, and the Court should award their reasonable attorney's fees and costs of litigation, including expert witness expenses.

Before filing this motion, counsel for Plaintiffs in good faith attempted to reach a settlement on the quantity of attorneys' fees with Defendant Nevada Power Company. To date, the parties have engaged in discussions and exchanged information, but have been unable to come to an agreement.

Respectfully submitted this 19th day of November, 2015.

s/ Robert B. Wiygul
ROBERT B. WIYGUL, ESQ. (pro hac vice)
Waltzer Wiygul & Garside, LLC
1011 Iberville Drive
Ocean Springs, MS 39564
Tel: 228-872-1125
Fax: 228-872-1128
robert@wwglaw.com

*Counsel for Plaintiffs*

s/ Gloria D. Smith
GLORIA D. SMITH, ESQ. (pro hac vice)
California Bar No. 200824
Sierra Club Environmental Law Program
85 Second Street
San Francisco, CA 94105
(415) 977-5532/ Fax: (415) 977-5793
gloria.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 6

   I.    PLAINTIFFS ARE PREVAILING PARTIES. ................................................. 6

   II.   CALCULATING THE LODESTAR. ................................................................. 8

     A.   The Time Expended by Plaintiffs' Counsel ............................................ 8

        1.    Preparation of the Notice Letter and Complaint ....................... 10

          i.   *Law Offices of Charles Tebbutt, P.C.* ...................... 11

          ii.  *Sierra Club Counsel* ................................................. 13

        2.    Litigation and Settlement Negotiations ...................................... 15

          i.   *Law Offices of Charles Tebbutt, P.C.* ...................... 15

          ii.  *Sierra Club Counsel* ................................................. 16

          iii. *Waltzer Wiygul Garside, LLC* .............................. 17

          iv. *Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP* ................ 18

     B.   The Hourly Rates of Plaintiffs' Counsel .............................................. 19

     C.   The Kerr Factors .................................................................................. 22

     D.   Plaintiffs' Costs, including for Expert Witnesses, are Reasonable .............. 25

CONCLUSION ............................................................................................................. 26

i

**TABLE OF EXHIBITS**

1.  Declaration of David Robertson

2.  Declaration of Robert Wiygul

3.  Declaration of Christopher Mixson

4.  Declaration of Gloria Smith

5.  Declaration of Andrea Issod

6.  Declaration of Charles Tebbutt

7.  Declaration of Daniel Galpern

8.  Declaration of Sara Matsumoto

# TABLE OF AUTHORITIES

**Cases**

Agent Orange Prod. Liab. Lit., 818 F.2d 226, 232-33 (2d Cir. 1987) ........................... 20

Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997)................................................... 19

Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008)...................... 8, 19

Cf. Kilopass Technology, Inc. v. Sidense Corp., 82 F. Supp.3d 1154, (N.D. Cal. 2015) ............. 9

Chalmers v. Los Angeles, 796 F.2d 1205, 1212 (1986) ............................................ 22

City of Burlington v. Dague, 505 U.S. 557, 561–62 (1992)......................................... 6

Doud v. Yellow Cab of Reno, 2015 WL 2379315 (D. Nevada May 18, 2015) ........................ 21

Earth Island Inst. v. S. Cal. Edison Co., 838 F. Supp. 458, 466-67 (S.D. Cal. 1993) ................ 22

Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1121 (9th Cir. 2000)...................................... 9

Gates v. Deukmejian, 987 F.2d 1392, 1397–98, 1405 (9th Cir. 1992)............................... 9

Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013) .............................. 8

Haw. Wildlife Fund v. Cnty. of Maui, 24 F. Supp. 3d 980, 993–98 (D. Haw. 2014) ................ 11

Ingram v. Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011).............................................. 19

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 706-07 (3d Cir. 2005)................. 19

Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974) ............................. 22

Kelly v. Wengler, 7 F. Supp. 3d 1069, 1082 (D. Idaho 2014)....................................... 22

Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975).............................. 8, 22

Morales v. City of San Rafael, 96 F.3d 359, 363 n.8 (9th Cir. 1996)............................... 8

Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008)................................ 9

Nance v. Jewell, 2014 U.S. Dist. LEXIS 32195, *8-10, 2014 WL 948844 (D. Mont. 2014) ...... 22

Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 318 (4th Cir. 1988) ............................... 19

Rapanos v. United States, 547 U.S. 715 (2006)....................................................... 11

iii

Resurrection Bay Conservation Alliance v. City of Seward, Alaska, 640 F.3d 1087, 1091 (9th Cir. 2011) .................................................................................................................... 6

Rum Creek Coal Sales v. Caperton, 31 F.3d 169, 179 (4th Cir. 1994) ........................................ 20

Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist., 574 F.3d 1054, 1058-59 (9th Cir. 2009) ............................................................................................................. 6

Smith v. District of Columbia, 466 F.Supp.2d 151, 156 (D.D.C. 2006) ...................................... 20

Trustees of Const. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co., 460 F.3d 1253, 1257 (9th Cir. 2006) .......................................................................................... 25

U.S. Pub. Interest Research Grp. v. Stolt Sea Farming, Inc., 301 F. Supp. 2d 46, 48 (D. Maine 2004) ....................................................................................................................... 19

Watson v. NCO Financial Systems, Inc., 2015 WL 1959163 (D. Nev. April 29, 2015)............... 8

**Statutes**

33 U.S.C. § 1365(d) (Clean Water Act)......................................................................................... 6

33 U.S.C. § 1365(d); 42 U.S.C. § 6972(e) .................................................................................... 25

42 U.S.C. § 6972 (RCRA) ............................................................................................................. 6

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Moapa Band of Paiute Indians (the "Moapa Paiutes") and Sierra Club respectfully request the Court award reasonable attorneys' fees, costs, and expert witnesses' fees. This motion is brought under the citizen-suit fee-shifting provisions of the Clean Water Act, 33 U.S.C. § 1365(d), and the Resource Conservation and Recovery Act ("RCRA"), 42 U.SC. § 6972(e).  Plaintiffs filed this suit to address contamination at Defendant Nevada Power Company's ("Nevada Power") Reid Gardner power plant.  The Reid Gardner site is directly adjacent to the Moapa Tribe's reservation and ancestral lands, and the residents of the reservation have endured years of pollution from the site.[1]  After nearly two years of litigation, the parties reached a judicially enforceable settlement that that will both directly protect adjacent residents from the impacts of the site, and also provide the Moapa tribe with the resources to effectively participate in the ongoing site assessment and cleanup process.[2]

Plaintiffs request that their attorneys and experts be compensated at reasonable hourly rates that account for the expertise necessary to handle this complex environmental litigation. The fees and costs requested by the attorneys who handled the case are summarized in their declarations.  As required by Local Rule 54-16, each attorney responsible for billing has provided a declaration containing an itemization and description of the work performed, an itemization of all costs sought to be charged, an authentication of the information contained in the motion, and confirmation that their bill has been reviewed and edited, and the fees and costs charged are reasonable.  *See* Exhibits 2-8.

---

[1] *See* Compl. ¶¶ 16–18, 24, 33–43, pp. 28–31, ECF No. 1.
[2] *See* Settlement Agreement, Ex. 1 to Proposed Order for Mot. to Approve Settlement, ECF No. 105-1 [hereinafter "Settlement Agreement"].

# BACKGROUND

For the last fifty years, Defendant Nevada Power Company ("Nevada Power") has owned and operated the Reid Gardner coal-fired power generating station on a site that straddles the Muddy River about 45 miles north of Las Vegas.[3]  Operations at Reid-Gardner have contaminated both aquifers and soil at the site.[4]   The long term assessment and cleanup of the site are presently the subject of an administrative proceeding at the Nevada Department of Environmental Protection.  The Moapa Tribe, whose community center is about one mile from the site, suffered particular harm.[5]  Tribe members regularly witnessed clouds of coal ash and particulates gather and lift from the site in desert winds and travel to their reservation.[6]  They also feared the pollution of the Muddy and its aquifer, an ancestral source of water, fishing, spiritual meaning, and recreation for the tribe.[7]  These problems moved Plaintiffs to legal action.[8]  Plaintiffs sued Nevada Power under the citizen-suit provisions of the Clean Water Act, 33 U.S.C. § 1365, and Resource Conservation and Recovery Act, 42 U.S.C. § 6972.[9]  Reaching the favorable resolution ultimately achieved for Plaintiffs required intensive legal and expert work.

Plaintiffs initially engaged Charlie Tebbutt and Dan Galpern of the Law Offices of Charles Tebbutt, P.C. to research and make recommendations on the case.  As explained in his declaration, Mr. Tebbutt has extensive national experience in environmental citizen suits.  With

---

[3] *See* Compl. ¶¶ 19–20, ECF No. 1.

[4] *See* Compl. ¶¶ 33, 77 – 86, ECF No. 1.

[5] *See* Compl. ¶¶ 16–18, 24, 33–43, ECF No. 1.

[6] *See* Compl. ¶ 34, ECF No. 1.

[7] *See* Compl. ¶¶ 16–18, 24, 33–43, ECF No. 1.

[8] *See* Compl. ¶¶ 16–18, 24, 33–43, pp. 28–31, ECF No. 1.

[9] *See* Compl., ECF No. 1.

early input from experts, Mr. Tebbutt and Mr. Galpern conducted an exhaustive data collection

and analysis effort, using primarily publicly available documents on the Reid Gardner site.  This

resulted in a highly detailed notice letter, required by both RCRA and the Clean Water Act

explaining Nevada Power's legal violations.[10]  When the notice letter and preliminary talks with

Nevada Power failed to produce results, the Plaintiffs filed this suit.[11]  After initial disclosures

and some preliminary motion practice,[12] the parties continued settlement talks beginning in the

spring of 2014.

　　　　　In the fall of 2014, the Plaintiffs determined to substitute Robert Wiygul and Mike Brown

of Waltzer Wiygul Garside, LLC, a similarly specialized environmental law firm based in New

Orleans, Louisiana and Ocean Springs, Mississippi.  Like Mr. Tebbutt, Mr. Wiygul is

experienced in representing non-profit organizations and Indian tribes in difficult environmental

litigation.  Mr. Wiygul and associate Mike Brown picked up preparing the case for eventual

motions or trial, and continued settlement negotiations.  In late 2014 and the spring of 2015 the

parties exchanged detailed proposals and met face to face as well as entering into a new

scheduling order and commencing voluminous electronic and paper discovery.

　　　　　The parties ultimately were able to reach an agreement in principle on a settlement

agreement after an April 2015 settlement conference with Judge Koppe.[13]  On July 28, 2015, the

parties submitted their Settlement Agreement for comment by the Department of Justice and

---

[10] *See* Notice of Intent to Sue, Att. A to Compl., ECF No. 1-1.

[11] *See* Compl. ¶ 14, ECF No. 1.

[12] *See, e.g.*, ECF Nos. 10, 32–33, 39, 52,

[13] *See* ECF No. 99 (Minute entry announcing confidential settlement between the parties)

potential approval by the Court.[14]  The Department of Justice in its comments recognized that the proposed terms of the settlement were appropriate under both the Clean Water Act and the Resource Conservation and Recovery Act, and therefore notified the Court that the United States had no objection to the settlement.[15]

The Settlement Agreement is a hard-won success for Plaintiffs in that it addresses their core concerns in filing suit: providing a path to addressing the contamination at the Reid Gardner site, and mitigating the health risks to tribe members posed by past and future pollution from the Reid-Gardner site.  The terms of the Settlement Agreement in some respects permitted the parties to more directly address the protection of adjacent residents than proceeding to a judgment in this matter.

First, the settlement gives the Moapa Paiutes the technical capacity to participate in the AOC process to understand and remediate pollution at Reid Gardner and its implications for tribe members and tribal lands.  The Settlement Agreement allocates the Moapa Paiutes $700,000 for pollution monitoring and technical assistance.[16]  It provides enforceable procedural rights for the Moapa Paiutes to access information exchanged in the AOC process.[17]

Second, the Settlement Agreement addresses the health risks to adjacent residents created by the facility.  It supplies $4.3 million in funding for supplemental environmental projects to remedy past harm, and the risk of future harm, to the Moapa Paiutes from existing pollution.[18]

---

[14] *See* ECF Nos. 105 & 105-1 (Motion to Approve Settlement and Proposed Order and Settlement Agreement).

[15] ECF No. 110.

[16] Settlement Agreement at 2–3.

[17] Settlement Agreement at 1–2.

[18] Settlement Agreement at 2.

The multi-million-dollar scale of project funds is transformative for the Moapa Paiutes, a small tribe with few resources otherwise to address the risks posed by Reid Gardner's pollution.[19]

The project funding comprises $1.5 million to construct and operate a wellness center to improve the health of reservation residents, including providing shelter for vulnerable sectors of the population from wind-blown contamination.[20]

It also secures $2.0 million to purchase water rights to mitigate the risks posed by the Reid-Gardner plant's operation to the tribe's ancestral use of the Muddy River and the adjacent aquifers.[21]  To aid the Moapa Paiutes in obtaining clean, stable sources of water, the Settlement Agreement creates a process for the Moapa Paiutes to negotiate the purchase up to 500 acre-feet of Nevada Power's own water rights at the Reid-Gardner site.[22]

Finally, the settlement commits Nevada Power to shutter the last of Reid Gardner's operating coal-fired power units by the end of 2017, providing a contractual obligation reinforcing the company's pre-existing commitment to shutter this unit , and insuring there is no future air pollution, coal ash contamination, and other pollution from the site.[23]

In short, the Settlement Agreement addresses the key issues that brought about this lawsuit, and given the uncertainties of litigation was a successful resolution.  It does not track all the relief requested in the Complaint, but in important respects goes beyond that relief.  Plaintiffs now seek the reasonable attorneys' fees and costs required to obtain this result.

---

[19] *See* Compl. ¶ 15, ECF No.1 (explaining that the tribe has just over 300 members, spread over 71,594 acres of reservation territory)

[20] Settlement Agreement at 2.

[21] Settlement Agreement at 2.

[22] Settlement Agreement at 3–6.

[23] Settlement Agreement at 2.

**ARGUMENT**

The Clean Water Act's fee-shifting provision provides, virtually identically to RCRA's provision, that:

> The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.

33 U.S.C. § 1365(d) (Clean Water Act), *accord* 42 U.S.C. § 6972 (RCRA); *see City of Burlington v. Dague,* 505 U.S. 557, 561–62 (1992) (construing both provisions in tandem and noting that both are guided by a rule of awarding "reasonable" fees). The district court's award of reasonable fees must rest on two findings: (1) "First, [the court] must find that the fee applicant is a prevailing or substantially prevailing party"; and (2) "Second, it must find that an award of attorney fees is appropriate." *Resurrection Bay Conservation Alliance v. City of Seward, Alaska*, 640 F.3d 1087, 1091 (9th Cir. 2011) (internal quotation marks omitted).

## I.   PLAINTIFFS ARE PREVAILING PARTIES.

There is no doubt that Plaintiffs are prevailing or substantially prevailing parties under the meaning of the law. The test for determining whether a plaintiff is a prevailing party is if the plaintiff "obtained judicially enforceable actual relief on the merits of [its] claim that materially alter[ed] the legal relationship between the parties." *Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058-59 (9th Cir. 2009) (internal quotation marks omitted). The Settlement Agreement easily meets both prongs of this test. It is judicially enforceable because it provides that this Court "will retain jurisdiction to enforce" its terms.[24] *See Saint John's Organic Farm*, 574 F.3d at 1059 (holding that an agreement is judicially

---

[24] *See* Settlement Agreement at 8.

6

enforceable where it "specifically provided that its terms would be enforceable by the district court").

The Consent Decree also secures Plaintiffs actual relief on the merits of their claims that materially alters the relationship between the parties.  The threshold for satisfying this statutory requirement "is not high," requiring only that "the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit."  *Id.* at 1059–60 (stating also that even an "extremely small amount of relief is sufficient to confer prevailing party status").

The Complaint in this matter laid out a series of requests for broad injunctive relief to address the threats from the Reid Gardner site, including ordering actions necessary to "eliminate any present and future endangerment," funding scientific studies regarding eliminating harm from the site, developing and implementing remediation plans, remediating the site (presumably in accordance with the plans), providing data to the Plaintiffs, and ordering civil penalties.[25]  As explained in the introduction and in the declarations, the ultimate settlement provided a path for the Moapa Paiute Tribe and the Sierra Club to achieve the goals that are sought in the complaint, and is very substantial relief.   Plaintiffs are clearly prevailing parties in this litigation.

The Ninth Circuit rule is that an award of citizen-suit attorneys' fees is "appropriate" unless "special circumstances are found."  *Resurrection Bay*, 640 F.3d at 1091.  Accordingly, the district court has only "narrow" discretion to deny a prevailing plaintiff's request for fees and costs, such as where the plaintiff failed adequately to brief issues it raised or the suit was frivolous.  *See Resurrection Bay*, 640 F.3d at 1092–93.  No such special circumstances apply

---

[25] *See* Amended Compl. pp. 30-33, ECF No. 38-1.

here, and, as explained more fully below, Plaintiffs' counsel invested justified time and effort in reaching the favorable result achieved.  Awarding attorneys' fees and costs is appropriate.

## II.    CALCULATING THE LODESTAR.

The Ninth Circuit endorses the "lodestar" method to calculate a plaintiff's reasonable attorneys' fees.  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008); *Resurrection Bay*, 640 F.3d at 1095.  The lodestar amount is the product of the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate for the attorneys involved.  *Camacho*, 523 F.3d at 978.  "There is a strong presumption that lodestar represents a reasonable fee."  *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996) (internal quotation marks omitted).[26]

The second step of the fee determination process is consideration of the twelve reasonableness factors set out in *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  Local Rule 56-14 also requires discussion of the *Kerr* factors.  Although the Court is required to explicitly consider the *Kerr* factors, "the lodestar should be modified only in exceptional cases."  *E.g. Watson v. NCO Financial Systems, Inc.,* 2015 WL 1959163 (D. Nev. April 29, 2015).

A.    The Time Expended by Plaintiffs' Counsel

The fee applicant bears the burden of submitting hourly billing records that support the reasonableness of fees requested.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).  The Ninth Circuit has expressed a preference for detailed, contemporaneous records, but

---

[26] Further, it is "well-established that time spent in preparing fee applications . . . is compensable" as a so-called, fee-on-fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1210 (9th Cir. 2013) (internal quotation marks omitted).  Plaintiffs include in their request the reasonable time spent preparing this motion and its supporting documents.

permits fee requests to be based on reconstructed records and records that do not "'record in great detail how each minute . . . was expended.'" *Fischer v. SJB-P.D. Inc.,* 214 F.3d 1115, 1121 (9th Cir. 2000).  *Cf. Kilopass Technology, Inc. v. Sidense Corp.,* 82 F. Supp.3d 1154, (N.D. Cal. 2015) (detailed declaration from co-lead attorney, expert reports, and expense records sufficient for $5.5 million award).

A reasonable amount of time spent on a case is that which "could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). In examining the number of hours expended, the Court should "defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case[.]"  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).  As the Ninth Circuit has recognized, plaintiffs' attorneys facing a speculative recovery under fee-shifting provisions have little incentive to "churn" and spend time or devote staff unnecessarily to the case.  *Moreno*, 534 F.3d at 1112.

Only those hours which the Court finds are "excessive, redundant, or otherwise unnecessary" should be excluded.  *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98, 1405 (9th Cir. 1992).  In complex litigation like the one at hand, the Ninth Circuit recognizes that some amount of duplicative work is unavoidable: "a lot of legal work product will grow stale," attorneys must "get up to speed with the research previously performed," and some "*necessary* duplication" is "inherent in the process of litigating over time."  *Moreno*, 534 F.3d at 1112.

The hours Plaintiffs' counsel expended on this case are documented in the declarations attached as Exhibits 2-8.  The two major stages of the litigation and the time submitted by each attorney for those stages are summarized below.  Each declaration summarizes the tasks that

went into this complex litigation, the review of hours that was made, and provides the attorneys'

testimony that the hours claimed are reasonable.

1.      Preparation of the Notice Letter and Complaint

The sources of decades-long pollution from Reid Gardner were manifold and complex.

The site's operation depended on accumulating and storing coal in massive, open piles,

continuously burning that coal to generate electricity, treating a half-million gallons of coal-

infused wastewater per day in numerous evaporation ponds, and transporting waste by open-bed

trucks along coal ash roads to be warehoused in an exposed, on-site landfill.[27]  Each step in this

process created unique conduits to the air and groundwater for an array of different toxic or

potentially toxic compounds.[28]

With the assistance of experts, as described below, Plaintiffs' counsel had to gain a firm

grasp on, among other issues, the area's hydrology, geology, and prevailing winds, to understand

the transport of each toxic compound from each source at the site, to and within the Muddy's

aquifer and the air.

The case was even more time intensive because the Reid-Gardner site has been in

existence, and generated its pollution, since the 1960s.[29]  It has also been under a sprawling and

evolving administrative oversight mechanism for over a decade.  The 2003 Administrative Order

on Consent ("AOC") between Nevada Department of Environmental Protection and Nevada

Power initiated an ongoing process to begin to assess and remedy contamination at Reid

Gardner.  The AOC process yielded a library's worth of reports, raw data, and remediation

---

[27] *See* Compl. ¶¶ 25–31, ECF No. 1.

[28] *See* Compl. ¶¶ 33–43, ECF No. 1.

[29] *See* Compl. ¶¶ 25, 27,  , ECF No.1

10

actions at the site.  Due diligence required counsel to have a command of this history even to

begin to litigate the case.  Data from approximately 80 monitoring wells had to be gathered,

placed in usable form, and evaluated.  The data from each well had to be evaluated based on

multiple maximum contaminant levels under state and federal law.

Citizens' suits generally raise contested issues like Article III standing, or whether a

discharge is covered by an existing permit.  This case raised those issues as well as difficult

issues unique to this case and site.  Plaintiffs' Clean Water Act case hinged on the developing

and conflicting law on when groundwater conduits for discharges into navigable waterways are

subject to the Clean Water Act, for which there was no controlling case law.  *See generally Haw.*

*Wildlife Fund v. Cnty. of Maui*, 24 F. Supp. 3d 980, 993–98 (D. Haw. 2014).   This legal

uncertainty stems, in part, from the unresolved, 4-4-1 split of the U.S. Supreme Court on the

question of the jurisdictional reach of the Clean Water Act in *Rapanos v. United States*, 547 U.S.

715 (2006).  *See Haw. Wildlife Fund*, 24 F. Supp. 3d at 993–98.  As another example, Nevada

Power objected, and was prepared to argue vigorously, that the AOC process relieved it of

liability, or limited the available remedy, for some of Plaintiffs' claims.[30]  Nevada Power further

contended that its discharges were protected by the fact that it had a storm water permit for the

site, and that the doctrines of primary jurisdiction or abstention were appropriate.

All of these legal and factual complexities affected the preparation and conduct of this

lawsuit and the lengthy settlement negotiations.

     *i.*      *Law Offices of Charles Tebbutt, P.C.*

Mr. Tebbutt and his firm performed the initial legal and background research required to

assess the strength of the case and file suit, and the firm also handled early motions practice and

---

[30] *See* Nevada Power's Amended Answer at p. 20, ECF No. 65.

11

settlement discussions up until the time that Plaintiffs changed counsel in November 2014.  Mr.

Tebbutt testifies in his declaration, submitted as Exhibit 6, about his qualifications, the factual

and legal research that went into preparing the extensive notice of intent to sue letter and the

initial complaint.  In summary, Mr. Tebbutt has over 27 years of experience, and has handled

over 100 citizen enforcement actions.  He testifies that this was one of the most fact-intensive

and complex cases he has been involved with.

Mr. Tebbutt testifies that he oversaw the work of attorneys Dan Galpern, Sarah

Matsumoto, and Dan Snyder on the case, and that all time spent on the case by him and these

attorneys was reasonable and necessary to the prosecution of the case and to provide a

foundation for a resolution.  Mr. Tebbutt seeks compensation for 204.9 hours spent on the case.

Mr. Galpern testifies in his declaration, submitted as Exhibit 7, that during the period of

his representation he was employed by and worked under the supervision of Mr. Tebbutt.  Mr.

Galpern is an attorney with ten years experience at the present date.  He has an extensive

background in environmental law, and prior experience in administrative proceeding involving

the Reid Gardner plant site.

Mr. Galpern billed 1,056.8 hours of work in this matter.  He testifies that approximately

40% of this time, or about 410 hours, was spent on the formation of the case through the filing of

the complaint, including developing legal theories and analyzing evidence.  Of this he states that

approximately 236 hours were spent on the research, drafting and editing of the notice letter and

initial complaint. Mr. Galpern and Mr. Tebbutt testify that as a matter of billing discretion he has

reduced his time requested for compensation by 10%.

The time Mr. Galpern spent on this phase of the case included planning and overseeing

the analysis of the site data.  Working with associate Sarah Matsumoto, Mr. Galpern gathered

and analyzed voluminous public and other records, and identified thousands of violations of action levels, either at the state or federal level, for contaminants of concern at the site.  Mr. Galpern also had primary responsibility for interaction with the Plaintiffs regarding case development strategy, and primary responsibility for coordination with technical experts.  Mr. Galpern testifies that the hours spent are reasonable in light of the complexity of the case.

Sarah Matsumoto provides a declaration, submitted as Exhibit 8, in which she testifies that she was admitted to the Oregon bar in May 2011.  Ms. Matsumoto has a background in environmental law, and began working for the Tebbutt firm in May 2012.  Ms. Matsumoto testifies that she performed some work on the case that was work that would generally be done by a paralegal.  From March 2013 to the present, she testifies that the work she did was the type that would ordinarily be performed by an attorney.  Ms. Matsumoto testifies that her primary role was in the development of the notice of intent to sue letter in the case, and that she spent approximately 121.7 hours on this phase of the case.  She testifies that she seeks compensation for only 100.5 of those hours. These hours involved extensive data analysis from paper and electronic records of monitoring at the site.  Ms. Matsumoto further testifies that she spent 15.5 hours in the preparation and filing of the complaint and related initiating documents in the case, but seeks compensation for 15 of those hours.

ii.      *Sierra Club In House Counsel*

Gloria Smith testifies in her declaration, submitted as Exhibit 4, that she is a managing attorney with the Sierra Club's environmental law program, and supervises a team of attorneys and assistants in environmental and energy related litigation across the western United States. She testifies that her legal career has focused on state and federal environmental law, and that

she received her J.D. in 1997.   Her work background includes government service, private practice and work at non-profits like the Sierra Club.

Ms. Smith testifies that her role in the litigation was to work with co-plaintiff the Moapa Tribe, and participate in the initial work with soil and hydrology experts and outside counsel. Ms. Smith testifies that the preparation for the suit included work on the notice letter, pleadings, coordinating with the Moapa Tribe, and attempts to reach a resolution with Nevada Power.  Ms. Smith's timesheets reflect that she spent 138.5 hours on the matter prior to the filing of the complaint.

Andrea Issod testifies that she is a senior attorney with the Sierra Club's environmental law program, and received her J.D. in 2003.  She has an extensive background in environmental law and litigation.  She currently has a docket of administrative and court actions nationwide. Her role is both actively litigating cases and coordinating with other parties and outside attorneys in litigation and settlement discussions.

Ms. Issod testifies that her time on this case was spent primarily on settlement negotiations, and that she spent approximately 44 hours prior to filing the complaint.  This included reviewing the technical basis for the complaint, assisting with drafting and reviewing pleadings, and communicating with the other parties.  Ms. Issod testifies that this time was reasonable and appropriately spent on this matter.

The declarations submitted therefore reflect that the following attorneys request compensation for the following hours for the investigation, drafting of the notice of intent to sue letter, pre-complaint client communications, and drafting of the complaint in this case:

14

*Law Office of Charles Tebbutt, P.C.*

| Charlie Tebbutt | 72.6 |
|---|---|
| Dan Galpern | 355.5 |
| Sarah Matsumoto | 115.5 |

*Sierra Club In House Counsel*

| Gloria Smith | 138.5 |
|---|---|
| Andrea Issod | 44 |

### 2.    Litigation and Settlement Negotiations

The parties had engaged in substantive discussions about possible resolution of the case prior to and following the filing of the initial complaint.[31]  Following the filing of the complaint, as explained below, these discussions continued and intensified.  In addition, however, the parties continued with the required exchange of disclosures, engaged in motion practice, prepared a discovery plan and took the other steps necessary to prepare the case for dispositive motions and trial if settlement talks failed.

### i.    Law Offices of Charles Tebbutt, P.C.

Mr. Tebbutt and Mr. Galpern's declarations set out the work they performed and the hours they claim for the time spent in the initial stages of the litigation and settlement discussions through the time that counsel was substituted in the fall of 2014.  These tasks included

---

[31] Declaration of Gloria Smith, Exhibit 4, at 5.

scheduling, disclosures, preparing the discovery plan, preparing for discovery and various motions.

Mr. Galpern testifies that he expended the following amounts of time on these tasks: approximately 190 hours in additional public records analysis subsequent to the filing of the complaint, approximately 89 hours on responding to a motion to dismiss and preparing an amended complaint, approximately 68 hours on other motions, and approximately 186 hours on settlement.  Mr. Galpern testifies that his full hours on the case should be the hours reflected on Attachment A to his declaration, which reflects a total of 670 hours post complaint.  As noted above, Mr. Galpern testifies that in his opinion these hours are reasonable.

Mr. Tebbutt seeks compensation for 132.3 hours for the period following the filing of the complaint until his withdrawal from the case, as reflected in his time records.  Ms. Matsumoto seeks compensation for 3.5 hours of paralegal tasks, and 47.1 hours of attorney time following the filing of the initial complaint.  Mr. Tebbutt further testifies that his own hours and those of Ms. Matsumoto, Mr. Galpern and Mr. Snyder are reasonable and appropriate for a case of this type and complexity.

### ii.    Sierra Club In House Counsel

As Ms. Smith's declaration attests, the settlement discussions continued and eventually intensified after the filing of the complaint.  The discussions reflected the technical nature of the case, and included technical meetings involving experts for both sides, several face to face settlement meetings, and preparation of detailed settlement proposals.  Since the Nevada Department of Environmental Protection was overseeing the administrative process on the site, this process also involved Nevada officials.   The Moapa Tribe is also a sovereign government, and acts only through its Tribal Council and authorized officials.  The attorneys were required to

brief the Council and responsible officials on the negotiations.  As Ms. Smith states, substantial

technical preparation was required for all of these meetings.   Ms. Smith also assisted with

preparation of initial discovery and discovery responses.  Ms. Smith requests 132.1 hours for her

time spent in litigation and on the settlement discussions.

Ms. Issod also continued to participate in the litigation, and assisted in crafting discovery

responses and insuring that discovery responses were complete.  This involved responding, for

example, to interrogatories seeking information on standing witnesses, insuring that all

documentary information in the possession of the Sierra Club was produced, and the like.  Ms.

Issod also participated in the settlement discussions, and spent time assessing proposals,

researching and crafting counterproposals, and attending technical and settlement conferences.

Ms. Issod requests compensation for 219.8 hours spent on the post-complaint litigation and

settlement discussions in the case.

iii.    *Waltzer Wiygul Garside, LLC*

Waltzer Wiygul Garside was requested to come into this case in the fall of 2014, while

discovery was stayed and settlement discussions were ongoing.   As the declaration submitted as

Exhibit 2 states, Robert Wiygul has spent most of the past 25 years litigating environmental

cases on the plaintiffs side, including citizen suits.  He spent approximately 266 hours on this

case through the filing of this fee petition.  A substantial amount of this time was spent on

settlement discussions, but as set out in his declaration, given the pending dates in the scheduling

order we were also undertaking initial discovery and preparing for depositions and preparation of

experts.   The settlement discussions were detailed and involved proposals, counterproposals,

and face to face meetings.  The documentary discovery was voluminous and also required

17

substantial time.  Mike Brown, an associate in Waltzer Wiygul Garside's New Orleans office, prepared first drafts and reviewed discovery responses.

Mr. Wiygul testifies that he has reviewed his own time and that of Mike Brown and removed entries that were excessive, unnecessary, or otherwise would not be appropriate for billing to a paying client.  As his declaration notes, he also opted to further reduce the time claimed by 15% to reflect the fact that many entries on his timesheets, although based on litigation files and conservatively estimated, were not fully contemporaneous.  Mr. Wiygul requests 226 hours for the time spent in the litigation, bringing the case to settlement, and preparing this fee petition, and 50.3 hours for Mr. Brown.   In short, these hours were necessary and appropriate to litigate this matter and bring it to a successful settlement.

      *iv.     Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP*

Christopher Mixson with the Wolf Rifkin firm acted as local counsel for the attorneys in this matter.  Mr. Mixson testifies in his declaration, submitted as Exhibit 3, that he spent a very modest 30 hours on this role, which is clearly reasonable in the circumstances.

 The declarations submitted therefore reflect that the following attorneys request compensation for the following hours for the post-complaint conduct of this case:

*Law Office of Charles Tebbutt, P.C.*

| | |
|---|---|
| Charlie Tebbutt | 72.6 |
| Dan Galpern | 395 |
| Sarah Matsumoto | 137.2 |

*Sierra Club In House Counsel*

| Gloria Smith | 132.1 |
|---|---|
| Andrea Issod | 219.8 |

*Waltzer Wiygul Garside, LLC*

| Robert Wiygul | 226 |
|---|---|
| Mike Brown | 55 |

*Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP*

| Chris Mixson | 31 |
|---|---|

B.      The Hourly Rates of Plaintiffs' Counsel

As to the reasonableness of counsel's hourly rates, courts in this circuit examine the

hourly rates charged for work performed by attorneys of comparable skill, experience, and

reputation in the "relevant legal community." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir.

2011) (per curiam).  The general rule is that the "relevant legal community" encompasses the

forum in which the District Court sits.  *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).

"However, rates outside the forum may be used 'if local counsel was unavailable, either because

they are unwilling or unable to perform because they lack the degree of experience, expertise, or

specialization to handle the case properly.'"  *Id*. (citing *Gates*, 987 F.2d at 1405); *accord*

*Camacho v. Bridgeport Financial,* 523 F.3d 973, 979 (9th Cir. 2008).

In environmental citizen suit cases, frequently there are no practitioners in the forum state

willing or sufficiently experienced to litigate the suit.  The courts have recognized this fact.  For

instance, in a RCRA enforcement action brought in New Jersey, the Third Circuit determined

that Washington, D.C. rates should be used, as there was no willing counsel in New Jersey who

19

would have accepted the representation. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 706-07 (3d Cir. 2005).  Other courts have reached a similar conclusion. *See, e.g., Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1988) (hourly rates based on Washington, D.C. market where no attorneys in Raleigh, NC market were capable to take case); *U.S. Pub. Interest Research Grp. v. Stolt Sea Farming, Inc.*, 301 F. Supp. 2d 46, 48 (D. Maine 2004) (Boston was relevant legal community for case brought in Portland, ME; no attorneys in forum capable of litigating dispute). *See also In re Agent Orange Prod. Liab. Lit.,* 818 F.2d 226, 232-33 (2d Cir. 1987)(noting exceptions to forum rule); *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994)(finding that using rates outside forum reasonable).

Likewise, the relevant legal community in this case is the national market for the small number of firms that regularly bring environmental citizen's suits such as this one, involving non-profit plaintiffs.  Plaintiffs are not aware of any attorney in Nevada who was available to bring the case.  As Mr. Wiygul and Nevada attorney G. David Robertson note in their declarations, they are aware of no attorneys available in Nevada with the kind of citizen suit experience necessary to properly litigate this matter, and who were also willing to do so on a full or partial contingency fee basis.

There are a number of different sources that the courts use to inform the rate determination. The Department of Justice's most recent Laffey Matrix indicates rates of $568 per hour for attorneys with 31 plus years experience.[32]   The Adjusted Laffey Matrix, which is a version of the Laffey Matrix that takes in to account the specific increase in costs in the legal market, establishes a current rate of $796 per hour in the 2012-2015 time period for attorneys of Mr. Tebbutt and Mr. Wiygul's vintage. The Adjusted Laffey Matrix has been considered more

---

[32] Exhibit 2, Declaration of Robert Wiygul, Attachment E.

appropriate given that it uses the inflation rate for legal services rather than the general consumer

inflation rate.  *Smith v. District of Columbia,* 466 F.Supp.2d 151, 156 (D.D.C. 2006).   The

adjusted *Laffey* matrix is available on line at http://www.laffeymatrix.com/see.html.

For 2014, the National Law Journal reports that, for example, partners at Hogan Lovells

billed at an average rate of $835 per hour, with a high of $1,000 per hour.  The lowest billing rate

for any partner at Hogan Lovells was $705 per hour.  Partners at Duane Morris averaged $620

per hour, with a high of $710 per hour.[33]

As noted, Nevada attorney G. David Robertson states that there are no attorneys in

Nevada with experience in this area.  However, Nevada rates for attorneys of Mr. Tebbutt, Mr.

Wiygul and Ms. Smith's vintage would range from $450 to $550 per hour, attorneys in Mr.

Galpern's and Ms. Issod's range would bill from $350 to $450 per hour, and those in Mr. Brown

or Ms. Matsumoto's range would bill from $250 to $350 per hour.  *See also Doud v. Yellow Cab

of Reno*, 2015 WL 2379315 (D. Nevada May 18, 2015)(noting 2011 declaration asserting hourly

rate for commercial litigation is higher than $500 per hour).

In their declarations, each attorney requesting a fee award in this matter has indicated the

hourly rate she or he considers appropriate, along with the basis for the assertion that the rate is

reasonable.   The rates requested by each attorney are the following:

| | |
|---|---|
| Charlie Tebbutt | $600 |
| Dan Galpern | $586 |
| Sarah Matsumoto (paralegal tasks) | $180 |
| Sarah Matsumoto (attorney tasks) | $331 |

[33] http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country
(last visited November 11, 2015).

21

| | |
|---|---|
| Robert Wiygul | $575 |
| Gloria Smith | $525 |
| Andrea Issod | $500 |
| Mike Brown | $350 |

C.    The *Kerr* Factors

The Ninth Circuit also recognizes that the factors originally articulated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), and adopted by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), provide guidance in determining a reasonable rate and fee.  This Court's Local Rule 56-14 requires consideration of those factors:

> (1) The time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or other circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Chalmers v. Los Angeles*, 796 F.2d 1205, 1212 (1986) (*Kerr* factors "are largely subsumed within the initial calculation of reasonable hours expended at a reasonably hourly rate[.]").  A number of courts have awarded higher hourly rates after considering the *Kerr* factors.  *See, e.g., Earth Island Inst. v. S. Cal. Edison Co.*, 838 F. Supp. 458, 466-67 (S.D. Cal. 1993) (awarding "premium" hourly rate based on the excellent representation provided by counsel); *Nance v. Jewell*, 2014 U.S. Dist. LEXIS 32195, *8-10, 2014 WL 948844 (D. Mont. 2014) (awarding $500/hour for Billings attorney on basis that, *inter alia*, lawyer's skill, experience, and reputation was deserving of such an award); *Kelly v. Wengler*, 7 F. Supp. 3d 1069, 1082 (D. Idaho 2014)

22

(while couched in terms of multiplier, court determined that counsel's quality representation was deserving of higher hourly rate).

The *Kerr* factors fully support the rates requested here:

*Time and Labor Required:*  As explained above, the time and labor required for this complex case was extensive.  This was not a case to be brought lightly, and it warranted the substantial amount of time spent on it.

*Novelty and Difficulty of the Questions Presented:*  The factual and legal questions in this case were both novel and difficult, as described above and in the declarations of counsel.

*Skill Requisite to Perform the Service Properly:*  Again as explained above, this case required familiarity with citizen suits and multiple areas of environmental law.

*Preclusion of Other Employment:*  As the time records submitted attest, this case required substantial time.  For example, Mr. Wiygul expended over 200 hours on the case over a span of approximately 10 months.  Any attorney who expects to keep up a reasonable relationship with her or his family members can only put in about 2000 billable hours a year.

*Customary Fee:*  This factor does not appear to apply here.

*Fixed or Contingent Fee:*  In this case Mr. Tebbutt and his associates were working on a fully contingent fee, and Mr. Wiygul was working on a largely contingent fee.  The Sierra Club's in-house counsel are salaried.

*Time Limitations Imposed:*  As the declarations submitted attest, this is a case which took and deserved a substantial amount of the available working hours for the attorneys.

*Amounts Involved and Results Obtained:*  As set out above, this is an important case and the results obtained in the settlement are highly significant, particularly for the residents of the Moapa Reservation adjacent to the plant.  The intent of this case was to address the

23

contamination at the Reid Gardner site, and protect the public and the environment.  The complaint sought several broad categories of relief, including plans for remediation, information sharing, a halt to offsite migration of contamination, and imposition of civil penalties.  The Moapa Tribe and the Sierra Club made the rational decision in settling the case that it was extremely important to provide resources for the Tribe to monitor and as necessary influence the existing State administrative process for assessing and remediating the Reid Gardner site.  They also made the decision that it was critical to provide protections to adjacent residents, including air quality monitoring.  These outcomes do not perfectly align with all of the relief requested in the complaint, but they represent a clear success, with multiple benefits for the public.

*Experience, Reputation and Ability of the Attorneys:*  As the declarations attest, all the attorneys involved have specific and advanced skills in environmental litigation.

*Undesirability of the Case*:  Cases like this one are highly risky for the plaintiffs' attorneys, who are required to spend large amounts of time on a case with uncertainties about both ultimate outcome and the timing of that outcome.  Further, not many attorneys are willing to take on a monopoly like Nevada Power, which has essentially unlimited funds for defense.

*Nature and Length of the Professional Relationship with the Client:*  Both Mr. Tebbutt and Mr. Wiygul have represented the Sierra Club in various matters for many years.  Mr. Tebbutt and his associates had represented the Moapa Paiutes in other matters involving the Reid Gardner plant.

*Awards in Similar Cases:*  Although cases of this nature are difficult to directly compare, as Mr. Tebbutt's declaration notes, similar cases have resulted in fee awards greater than those sought here.

D.    <u>Plaintiffs' Costs, including for Expert Witnesses, are Reasonable</u>

Plaintiffs' costs of $148,224 in this matter, including expert witness fees, are reasonable. The Clean Water Act's and RCRA's fee-shifting provisions specifically allow for recovery of "costs of litigation" that include expert witness fees. *See* 33 U.S.C. § 1365(d); 42 U.S.C. § 6972(e).  An attorney's compensable costs also "include reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client," and court costs. *See Trustees of Const. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006).

As more fully detailed in the Declarations of Ms. Issod and Mr. Wiygul, Plaintiffs' costs include, *inter alia*, expert costs, airfare, car rental, lodging, meals, copying charges, and other expenses directly related to the lawsuits.  We note that unlike many private law firms, Waltzer Wiygul Garside does not bill separately for computerized legal research, telecommunications, or routine copying costs.  These costs are covered by the attorneys' hourly rate and are considered a cost of doing business.  The costs for which Plaintiffs seek compensation are of the type that would normally be charged to a fee-paying client. *Trs. of the Constr. Indus.*, 460 F.3d at 1257.

As part of their request for costs, the Sierra Club seeks an award of $138,701 to reimburse their expert witness and other expenses.  To build and prosecute their case, expert assistance was necessary to document and understand each of the Reid-Gardner site's pollution sources and their underlying hydrological, geological, chemical, and ambient environmental conditions, as well as to digest the results of the AOC process.  Plaintiffs hired an expert in engineering and geology, Elliott Lipps, P.G., and an environmental engineering and remediation expert, Dr. Ranajit Sahu—both highly qualified and experienced in their fields—to undertake this considerable and difficult work.

Mr. Lipps and Dr. Sahu performed duties typical of expert witnesses: advising Plaintiffs and counsel, modeling pollution pathways at the site, and drafting expert reports.  In addition, both experts participated in direct, technical discussions concerning the Reid-Gardner site with staff of the Nevada Department of Environmental Protection working on the AOC process. These specialist-to-specialist meetings were invaluable in assessing the state of existing remediation work at the Reid-Gardner site and setting Plaintiffs' approach in discovery and settlement negotiations.   Mr. Lipps and Dr. Sahu were vital to the litigation of this case, and their expenses should be fully compensated.

Ms. Issod also testifies that the Sierra Club had travel expenses of $6531.48.  Mr. Wiygul testifies in his deposition that the travel and other costs incurred by Waltzer Wiygul Garside, in the amount of $3,734.46, are reasonable and necessary.

The Court should award Plaintiffs their full costs, which are reasonable and were necessary to the successful conclusion of this suit.

## CONCLUSION

Plaintiffs respectfully submit that they are prevailing parties, and that the Court should determine and award reasonable attorneys' fees, costs and expenses as supported by the evidence.  The declarations of the attorneys seeking a fee award in this matter reflect the following requests:

*Law Offices of Charles Tebbutt, P.C.*

| Attorney | Time | Rate | Total |
|----------|------|------|-------|
| Tebbutt | 204.9 | $600(reduced from Laffey rates) | $122,940 |
| Galpern | 1,065.1 | $586 | $557,356 |

| Matsumoto (paralegal) | 126.8 | $180 | $19,008 |
| Matsumoto (attorney) | 64.9 | $331 | $20,555 |
| Snyder | 15.3 | $406 | $6,211 |

*Waltzer Wiygul Garside, LLC*

| Attorney | Time | Rate | Total |
| --- | --- | --- | --- |
| Robert Wiygul | 226 | $575 | $129,950 |
| Mike Brown | 55 | $350 | $19,250 |

*Sierra Club in House Counsel*

| Attorney | Time | Rate | Total |
| --- | --- | --- | --- |
| Gloria Smith | 270.6 | $525 | $142,065 |
| Andrea Issod | 263.8 | $500 | $131,900 |

*Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP*

| Attorney | Time | Rate | Total |
| --- | --- | --- | --- |
| Chris Mixson | 31 | $300 | $9,300 |

*Expert Witness Fees, Travel and Other Costs*

| Sierra Club | $145,232 |
| --- | --- |
| Waltzer Wiygul Garside | $3,734.46 |

27

Respectfully submitted this 19th day of November, 2015.


s/ Robert B. Wiygul
ROBERT B. WIYGUL, ESQ. (pro hac vice)
Waltzer Wiygul & Garside, LLC
1011 Iberville Drive
Ocean Springs, MS 39564
Tel: 228-872-1125
Fax: 228-872-1128
robert@waltzerlaw.com

*Counsel for Plaintiffs*

s/ Gloria D. Smith
GLORIA D. SMITH, ESQ. (pro hac vice)
California Bar No. 200824
Sierra Club Environmental Law Program
85 Second Street
San Francisco, CA 94105
(415) 977-5532/ Fax: (415) 977-5793
gloria.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

28